UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

RUDOLPH BETANCOURT,                )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )     Civil Action No.: 0:23-cv-60478-AHS
                                   )
786 PROPERTY, INC. and LA UNION, INC. )
                                   )
        Defendants.                )
_____)

### 786 PROPERTY, INC's ANSWER TO COMPLAINT AND CROSS-CLAIM AGAINST LA UNION, INC.

Defendant, 786 PROPERTY, INC., by and through its undersigned attorney files its Answer to Plaintiff's Complaint and Cross-Claim against Defendant La Union, Inc. and in support thereof alleges as follows:

1.    Defendant 786 PROPERTY, INC admits the allegations of the Complaint for designated paragraphs 1, 3, 7, 9 and 10.

2.    Defendant 786 PROPERTY, INC denies sufficient knowledge or information to form a belief as to the allegations of the Complaint designated paragraphs 4 through 6, 12 through 16, 19, 21, 27 and 28.

3.    Defendant 786 PROPERTY, INC denies the allegations of the Complaint designated paragraphs 2, 8, 11, 17, 18, 20 and 22 through 26.

### FIRST AFFIRMATIVE DEFENSE

Plaintiff lacks standing to assert the claims set forth in the Complaint in that he has not sustained an injury in fact, has not sustained a real and immediate threat of future injury and he will not suffer disability discrimination in the future at Defendants' location.

1

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's request for injunctive relief seeking structural changes, including moving walls, electric facilities, plumbing, water supply lines, drains and other facilities are not readily achievable.  These requested changes are not easily accomplished and cannot be carried out without significant difficulty or expense.

## THIRD AFFIRMATIVE DEFENSE

The Plaintiff's claims are barred by the Doctrine of Unclean Hands.  In seeking affirmative relief in this action, Plaintiff is engaging in bad faith litigation, directly related to the within ADA lawsuit that injures Defendant and makes it inequitable for Plaintiff to be entitled to an Injunction, or an award of attorney's fees.

Although Plaintiff's remedy under the ADA is limited to injunctive relief against future discriminatory practices, and Plaintiff is not entitled to damages for ADA violations, Plaintiff is engaging in bad faith litigation in order to obtain prohibited financial benefits.

As a resident of Michigan with a son, friends and former military colleagues living in South Florida, Plaintiff uses the pretext of disability discrimination to file ADA lawsuits so as to obtain reimbursement for hotels, airfare, food and other compensation for his otherwise purely personal travel.

During a recent trip to South Florida between January 5, 2023 and January 8, 2023, Plaintiff filed ADA actions against two (2) hotels and eight (8) restaurants, all in an effort to obtain prohibited financial benefits for his purely personal expenses.

In a bad faith litigation strategy, Plaintiff has filed more than two hundred (200) lawsuits, congesting the dockets of the courts, all designed to obtain prohibited financial benefits.

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333 • FAX (954) 454-5081 • E-MAIL: MPerlman@SoFlaLaw.com

Defendant 787 Property, Inc. has been damaged by this lawsuit, filed by a Plaintiff with unclean hands, in that it has been sued for ADA violations which are properly the obligation of its Co-Defendant LA Union, Inc. pursuant to the terms of its Lease.

Further, in the past, Defendant 787 Property, Inc. has taken action to comply with the ADA.

It would be inequitable for this Court to grant injunctive relief, or award attorney's fees when Defendant 787 Property, Inc. has an agreement with its tenant to perform the repairs to the property and has previously sought to comply with the ADA, given Plaintiff's bad faith motivation in bringing this action.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are moot or soon to become moot as Defendant has a plan in place to address the accessibility issues raised in the Complaint.

### FIFTH AFFIRMATIVE DEFENSE

Defendant has a policy of complying with the requirements of the ADA and is in the continuing process of removing barriers for use by the disabled.  Defendant has been the subject of two previous ADA actions relating to this property and has made repairs and improvements to the property to comply with the requirements of the ADA. Defendant has required its Tenant to comply with the ADA by negotiating a Lease term whereby LA Union is contractually obligated to comply with all requirements of the Americans With Disabilities Act.  Plaintiff's claims for attorney's fees and cost should be denied.

### ATTORNEY'S FEES

Defendant has retained the undersigned attorney and has agreed to pay a reasonable fee for its services rendered herein. Pursuant to 28 U.S.C. §1927 and  42 U.S.C. §12205 Defendant is entitled to recover reasonable attorney's fees in the event

3

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333  •  FAX (954) 454-5081  •  E-MAIL: MPerlman@SoFlaLaw.com

that it is determined to be the prevailing party or otherwise demonstrate an entitlement to fees under said statutes.

WHEREFORE, Defendant, 786 PROPERTY, INC. respectfully requests a Judgment in its favor, including an award of court costs, attorney's fees, a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and for such other and further relief as to this Court may seem just and proper.

## CROSS-CLAIM AGAINST LA UNION, INC.

Defendant/Cross-Claimant 786 PROPERTY, INC., by and through its undersigned attorney sues the Defendant/Cross-Defendant La Union, Inc. and in support thereof alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Cross-Claim pursuant to Rule 13(g) of the Federal Rules of Civil Procedure since the within Cross-Claim arises out of the transaction or occurrence that is the subject matter of the original action and/or relates to real property that is the subject of the original action.

2. This Cross-claim involves the breach of a Lease requiring the Cross-Defendant to comply with the Americans With Disabilities Act and involves a common nucleus of operative facts with the original action.

3. Venue is proper in this Court since all events giving rise to this Cross-Claim occurred in, and the real property that is the subject of this action is located in, the Southern District of Florida.

## THE PARTIES

4. Cross-Claimant 786 PROPERTY, INC. is a Florida corporation, duly organized and authorized to transact business in the State of Florida and within this judicial district.

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333 • FAX (954) 454-5081 • E-MAIL: MPerlman@SoFlaLaw.com

5.     Cross-Defendant La Union, Inc. is a Florida corporation, duly organized and authorized to transact business in the State of Florida and within this judicial district.

6.     Cross-Claimant 786 PROPERTY, INC. is the Landlord and Cross-Defendant La Union, Inc. is the Tenant under a certain Lease Agreement dated June 21, 2011.

## COUNT I: BREACH OF CONTRACT

7.     Cross-Claimant repeats, reiterates and realleges each and every allegation of the Cross-Claim designated paragraphs 1 through 6 as if more fully set forth herein at length.

8.     On June 21, 2011 Cross-Claimant 786 PROPERTY, INC. and Cross-Defendant La Union, Inc. entered into a certain Lease Agreement, a copy of which is annexed hereto and designated Exhibit "A".

9.     Article IV of the foregoing Lease Agreement provides in pertinent part as follows:

> "Section 4.1 USE.  .  .  .  Tenant shall, at its sole cost, promptly comply with all Laws now or hereafter enacted with respect to the Leased Premises whether in order to meet the special needs of Tenant or by reason of the occupancy thereof or otherwise, and Tenant shall make all alterations and additions to the Lease Premises required by applicable governmental authorities with respect thereto.  Without limiting the foregoing, **Tenant shall, at its sole cost, promptly comply with all requirements of the American With Disabilities Act ("ADA")** with respect to the Leased Premises."  (Emphasis added)

10.    In addition, Article 6.2 of the Lease Agreement requires the Tenant to perform all repairs and alterations required by applicable Laws.

11.    Cross-Defendant La Union, Inc. breached the foregoing Lease Agreement by failing to comply with the requirements of the ADA, and by failing to perform the

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333 • FAX (954) 454-5081 • E-MAIL: MPerlman@SoFlaLaw.com

repairs and alteration required by the ADA, all as more specifically set forth in Plaintiff's Complaint designated paragraph 17.

12.     As a result of the foregoing breach of the Lease Agreement by Cross-Defendant La Union, Inc., the Cross-Claimant has sustained damages in excess of the sum of $75,000.

13.     Cross-Claimant 786 PROPERTY, INC. complied with all conditions precedent under the Lease Agreement, including providing ten (10) day's notice to cure Cross-Defendant's breach of contract, a copy of which is annexed hereto as Exhibit "B", however, Cross-Defendant has failed to cure its Lease violation.

14.     Cross-Claimant has retained the undersigned attorney and has agreed to pay a reasonable fee for his services rendered herein. Pursuant to Section 11.25 of the Lease Agreement Cross-Claimant is entitled to recover reasonable attorney's fees in the event that it is determined to be the prevailing party or otherwise demonstrate an entitlement to fees under the provisions of the Lease Agreement.

WHEREFORE Cross-Claimant 786 PROPERTY, INC. demands Judgment against Cross-Defendant La Union, Inc. for a sum which exceeds Seventy-Five Thousand ($75,000.00) Dollars, together with costs of the action and reasonable attorney's fees.

## COUNT II: CONTRACTUAL INDEMNITY

15.     Cross-Claimant repeats, reiterates and realleges each and every allegation of the Cross-Claim designated paragraphs 1 through 6 as if more fully set forth herein at length.

16.     On June 21, 2011 Cross-Claimant 786 PROPERTY, INC. and Cross-Defendant La Union, Inc. entered into a certain Lease Agreement, a copy of which is annexed hereto and designated Exhibit "A".

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333 • FAX (954) 454-5081 • E-MAIL: MPerlman@SoFlaLaw.com

17.     Article XI of the foregoing Lease Agreement provides in pertinent part as follows:

> "Section 11.4 INDEMNITIES.  Tenant shall indemnify, defend and hold harmless Landlord  .  .  .   from and against all losses, claims expenses (including attorney's fees), liabilities, lawsuits injuries and damages of whatever nature if (a) occurring in the Lease Premises unless caused by the gross negligence or willful misconduct of Landlord or Landlord's agents; (b) claimed to have been caused by or resulted from any act or omission of Tenant, its agents contractors, employees, subtenants, assignees, concessionaires and invitees, no matter where occurring; or (c) due to any breach or default of Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim, action or proceeding brought against Landlord and/or Landlord's agents, including, without limitation, all reasonable attorney's fees and expenses."

18.     Plaintiff has brought the original action against Cross-Claimant alleging violations of the ADA, and seeking an Injunction requiring Cross-Claimant to make the demised premises readily accessible to individuals with disabilities, and seeking certain other relief.

19.     Plaintiff's Complaint against Cross-Claimant alleges violations of the ADA which are the responsibility of Cross-Defendant over to Cross-Claimant under paragraphs 4.1 and 6.2 of the Lease Agreement.

20.     Cross-Defendant is at fault in not complying with the requirements of the ADA.

21.     Cross-Claimant is now obligated to pay the expenses of complying with the ADA because of Cross-Defendant's breach of its contractual duties, and Cross-Defendant should bear the costs thereof pursuant to the indemnification provisions of the Lease Agreement.

22.     Cross-Defendant breached the foregoing Indemnitee Agreement contained in the Lease by failing defend and hold Cross-Claimant harmless from Plaintiff's action.

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333  •  FAX (954) 454-5081  •  E-MAIL: MPerlman@SoFlaLaw.com

23.     As a result of the foregoing breach of the indemnity agreement and breach of contract, Cross-Claimant has sustained damages to repair the leased premises to comply with the ADA, to pay Plaintiff costs and attorney's fees and to defend Plaintiff's action, including incurring the cost of defense of said action, consisting of costs and attorney's fees in excess of the sum of $75,000.

24.     Cross-Claimant 786 PROPERTY, INC. complied with all conditions precedent under the Lease Agreement, including providing ten (10) day's notice to cure Cross-Defendant's breach of contract, a copy of which is annexed hereto as Exhibit "B", however, Cross-Defendant has failed to cure its Lease violation.

25.     Cross-Claimant has retained the undersigned attorney and has agreed to pay a reasonable fee for his services rendered herein. Pursuant to Section 11.25 of the Lease Agreement Cross-Claimant is entitled to recover reasonable attorney's fees in the event that it is determined to be the prevailing party or otherwise demonstrate an entitlement to fees under the provisions of the Lease Agreement.

WHEREFORE Cross-Claimant 786 PROPERTY, INC. demands Judgment against Cross-Defendant La Union, Inc. for a sum which exceeds Seventy-Five Thousand ($75,000.00) Dollars, together with costs of the action and reasonable attorney's fees.

## COUNT III: SPECIFIC PERFORMANCE

26.     Cross-Claimant repeats, reiterates and realleges each and every allegation of the Cross-Claim designated paragraphs 1 through 6 as if more fully set forth herein at length.

27.     On June 21, 2011 Cross-Claimant 786 PROPERTY, INC. and Cross-Defendant La Union, Inc. entered into a certain Lease Agreement, a copy of which is annexed hereto and designated Exhibit "A".

28.     Article IV of the foregoing Lease Agreement provides in pertinent part as

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333  •  FAX (954) 454-5081  •  E-MAIL: MPerlman@SoFlaLaw.com

follows:

> "Section 4.1 USE. . . . Tenant shall, at its sole cost, promptly comply with all Laws now or hereafter enacted with respect to the Leased Premises whether in order to meet the special needs of Tenant or by reason of the occupancy thereof or otherwise, and Tenant shall make all alterations and additions to the Lease Premises required by applicable governmental authorities with respect thereto. Without limiting the foregoing, **Tenant shall, at its sole cost, promptly comply with all requirements of the American With Disabilities Act ("ADA")** with respect to the Leased Premises." (Emphasis added)

29.     In addition, Article 6.2 of the Lease Agreement requires the Tenant to perform all repairs and alterations required by applicable Laws.

30.     Cross-Defendant has failed and refused to comply with the requirements of the ADA as required by the terms of the Lease Agreement.

31.     Article X of the foregoing Lease Agreement provides in pertinent part as follows:

> "Section 10.1 TENANT DEFAULT.  In the event of a default by Tenant hereunder, **Landlord may**, at its option and without further notice, in addition to all other remedies available at law or in equity: . . . **(c) obtain** injunctive or declaratory relief and/or **specific performance of any term, covenant or condition of the Lease**;" (Emphasis added)

32.     Cross-Defendant's Lease obligations to comply with the terms of the ADA and Cross-Claimant's remedy of specific performance are definite and certain terms of the Lease Agreement.

33.     In fairness and equity, Cross-Defendant should be required to specifically perform the Lease Agreement by being required to comply with the requirements of the ADA, to the extent that the demised premises in fact violate the ADA.

34.     Cross-Claimant 786 PROPERTY, INC. complied with all conditions precedent under the Lease Agreement, including providing ten (10) day's notice to cure

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333  •  FAX (954) 454-5081  •  E-MAIL: MPerlman@SoFlaLaw.com

Cross-Defendant's breach of contract, a copy of which is annexed hereto as Exhibit "B", however, Cross-Defendant has failed to cure its Lease violation.

35.     Cross-Claimant has retained the undersigned attorney and has agreed to pay a reasonable fee for his services rendered herein. Pursuant to Section 11.25 of the Lease Agreement Cross-Claimant is entitled to recover reasonable attorney's fees in the event that it is determined to be the prevailing party or otherwise demonstrate an entitlement to fees under the provisions of the Lease Agreement.

WHEREFORE Cross-Claimant 786 PROPERTY, INC. demands Judgment against Cross-Defendant La Union, Inc. for Specific Performance requiring Cross-Defendant to comply with the requirements of the ADA, together with costs of the action and reasonable attorney's fees.

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 26, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing by CM/ECF

Mark Perlman, Esq. (FBN: 256714)
*Attorney for Defendant 786 Property, Inc.*
Mark Perlman, P.A.
4651 Sheridan street, Suite 200
Hollywood, FL 33021
Telephone:   (954) 456-1333
MPerlman@SoFlaLaw.com

N:\Answers\787.Property.Ans.docx

MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200, HOLLYWOOD 33021
TEL. (954) 456-1333  •  FAX (954) 454-5081  •  E-MAIL: MPerlman@SoFlaLaw.com

# LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made and entered into as of the ____ day of June, 2011, by and between 786 PROPERTY, INC., a Florida corporation ("Landlord") and DAISY HELM, ("Tenant").

WITNESSETH:

## ARTICLE I
### REFERENCE PROVISIONS AND ENUMERATION OF EXHIBITS

**Section 1.1 REFERENCE PROVISIONS.** Where used in this Lease, the designated terms hereinafter set forth shall have the meanings ascribed by the provisions of this Section 1.1:

(a)     "SHOPPING CENTER" – That certain real property located at 7796-7798 Wiles Road, Coral Springs, FL 33067 (the "Shopping Center") together with all improvements now located or hereafter erected thereon, less any deletions pursuant to this Lease, plus such additions as Landlord may from time to time designate as comprising part of the Shopping Center.

(b)     "COMMON AREA" – All areas and facilities in the Shopping Center designated by Landlord for the general use, in common, of occupants of the Shopping Center, including Tenant hereunder, its officers, agents, employees and customers.  Common Areas shall include the parking areas, sidewalks, canopies, roadways, loading platforms, washrooms, ramps and landscaped areas.

(c)     "ANCHORS" – Not applicable.

(d)     "TENANT'S TRADE NAME" – To be determined

(e)     "LEASED PREMISES" – That certain space located at 7796 Wiles Road, Coral Springs, FL 33067, containing approximately 1,200 rentable square feet located in the Shopping Center.

(f)     "FLOOR AREA" – The actual number of rentable square feet of floor space within the Leased Premises and any area outside the Leased Premises which is exclusively appropriated for use by Tenant; subject, however, to the limitations as herein provided.

(g)     "PERMITTED USE" – Tenant shall use the Leased Premises solely for the operation of a bakery shop (with such seating for consumption as is permitted by applicable ordinance) and for no other purpose unless approved in writing by Landlord.

(h)     "TERM" – The term of this Lease shall commence upon the date of this Lease and expire on August 31, 2016, unless extended or sooner terminated as provided for herein.

(i)     "RENT COMMENCEMENT DATE" – Rent shall commence on September 1, 2011. For purposes of this Lease, a "Lease Year" shall be defined as that twelve (12) month period during the Term (including any extensions), commencing on the Rent Commencement Date or the annual anniversary thereof, as may be applicable; provided, however, that if the Rent Commencement Date is a day other than the first day of the calendar month, then the first Lease Year shall include that period of time from the Rent Commencement Date up to the first day of the next calendar month, and any subsequent Lease Year shall be the twelve (12) month period beginning on the first day of such month.

(j)     "MINIMUM RENT" – Minimum Rent over the term of this lease is a total of $113,196.62, payable in installments as follows: $1,364.77 each month, commencing on the Rent Commencement Date and payable on the first day of each calendar month thereafter for the balance of the first Lease Year; for the second (2nd) Lease Year, Minimum Rent shall be $1,900.00 each month; for the third (3rd) Lease Year, Minimum Rent shall be $1,976.00 each month; for the fourth (4th) Lease Year, Minimum Rent shall be $2,055.04 each month;  and for the fifth (5th) Lease Year, Minimum Rent shall be $2,137.24 each month.

(k)     "OPERATING EXPENSES" – This is a fully net lease and Tenant shall pay its Proportionate Share of Operating Expenses as defined in and accordance with Section 2.3 of this Lease on the first (1st) day of each month along with the Minimum Rent. For the period September 1, 2011 through August 31, 2012, Tenant's share of Operating expenses is fixed in the sum of $333.34 per month.

(l)     "INITIAL DEPOSIT" – a total of FIVE THOUSAND SEVEN HUNDRED THIRTY SEVEN and 24/100 ($5,737.24), consisting of the first month's Minimum Rent, Operating Expenses and sales tax in the sum of $1,800.00; a deposit towards the last month's Minimum Rent, Operating Expenses and sales tax in the sum of $2,137.24;  and the Security Deposit in the sum of $1,800.00.

(m)     "RENT INCREASE" – Not applicable.

## EXHIBIT "A"

DH      N.M.
      1-27-2011

(n)     **"CONSTRUCTION OBLIGATIONS"** – Landlord's sole obligation to ready the Leased Premises for occupancy by Tenant is to install new air conditioning unit and replace matching damaged ceiling tiles.

(o)     **"ADDRESSES FOR NOTICE & PAYMENTS"**-

| LANDLORD NOTICE: | LANDLORD PAYMENT: | TENANT NOTICE: |
|---|---|---|
| 786   PROPERTY,   INC.,   a   Florida corporation<br>10820 Haydn Drive<br>Boca Raton, FL 33498 | 786   PROPERTY,   INC.,   a   Florida corporation<br>10820 Haydn Drive<br>Boca Raton, FL 33498 | DAISY HELM<br>5676 NW 127 Terrace<br>Parkland, FL 33076 |

(p)     **"BROKERS"** – The sole Broker involved in this transaction is Legacy realty Services, LLC, whose commission shall be paid by Landlord.

(q)     **"SECURITY DEPOSIT"** – One Thousand Eight Hundred Dollars ($1,800.00)

**Section 1.2 GRANT.** Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Leased Premises pursuant to the terms hereof. The roof, air space above the roof, exterior walls of the Leased Premises and dividing walls between the Leased Premises and any adjoining Leased Premises and the land beneath the Leased Premises are reserved unto Landlord and Landlord shall have the right to install, maintain and repair utility lines in such areas. Subject to the terms of this Lease, Tenant shall have the non-exclusive right to use the Common Areas in common with Landlord and the other tenants of the Shopping Center.

**Section 1.3 ACCEPTANCE OF LEASED PREMISES.** By accepting possession of the Leased Premises, Tenant shall be deemed to have accepted the Leased Premises, to have acknowledged that same are in the condition required hereunder and to have agreed that all obligations of Landlord under the Lease have been fully performed.

**Section 1.4 QUIET ENJOYMENT.** Upon payment of the Rent and the performance of all of Tenant's obligations hereunder, Tenant shall peaceably and quietly enjoy the Leased Premises during the Term without interruption by Landlord or any person claiming by, through or under Landlord, subject to the terms of this Lease and all mortgages, ground or underlying leases, agreements and encumbrances to which this Lease is or may be subordinated.

**ARTICLE II**
**RENT**

**Section 2.1 MINIMUM RENT.** Tenant shall pay to Landlord the Minimum Rent set forth in Section 1.1(j), in advance, on the first day of each calendar month throughout the Term, prorated for any partial calendar month. Tenant shall commence paying Minimum Rent and Additional Rent on the Rent Commencement Date. All sums due hereunder other than Minimum Rent shall be deemed "Additional Rent". Additional Rent shall be due and payable on demand unless another time is expressly provided for payment herein. Minimum Rent and Additional Rent shall collectively be referred to in this Lease as "Rent". All Rent shall be payable without notice, demand, setoff or deduction whatsoever and shall be delivered to Landlord's address set forth in Section 1.1(o). The obligation to pay Rent is an independent, unconditional covenant and shall continue to be payable in all events unless expressly provided otherwise in this Lease.

**Section 2.2 SALES TAX AND OTHER TAXES.** Tenant shall pay, as Additional Rent, on a monthly basis concurrently with the payment of Rent, all sales, use and other taxes assessed by governmental authorities against Rent herein. In addition, Tenant shall pay before delinquency all taxes imposed on fixtures, equipment and other personalty located in the Leased Premises and on Tenant's business conducted therein.

**Section 2.3 OPERATING EXPENSES.** Tenant shall pay to Landlord, as Additional Rent, Tenant's Proportionate Share of all costs and expenses of owning, operating, servicing, managing, maintaining, repairing, replacing, securing, insuring and improving the Shopping Center ("Operating Expenses"). The term "Proportionate Share" shall mean 1/3 (one third) of real estate taxes applicable to the Shopping Center and ½ (one half) of all other Operating Expenses. Operating Expenses include, by way of example only, without limitation: (a) Employees: Salaries, wages, medical, surgical and general welfare benefits, life insurance, pension payments, payroll taxes, workmen's compensation, unemployment insurance contributions and reimbursable expenses; (b) Utilities: water, sewer, electric, power, fuel, utility lines and all other utilities; (c) Insurance: all premiums for all insurance maintained by Landlord including but not limited to commercial general liability insurance, special form property insurance covering all Common Areas and buildings in the Shopping Center (including all leasehold improvements, equipment, fixtures and machinery installed in such buildings by Landlord, but excluding permanent leasehold improvements installed by tenants and personal property, movable trade fixtures and contents of tenants) and any other risks Landlord may elect or be required to insure; (d) Building Maintenance: general building maintenance, repairs and replacements including but not limited to painting, repairing and replacing roofs, gutters, downspouts and walls, upkeep and servicing equipment therein, including all supplies, equipment, tools and materials required; (e) Management: the management fee paid to the management

DH

N. M.
6-21-2011

company managing the Shopping Center for Landlord, administrative costs and fees, and supervisory costs and fees; (f) Taxes and Fees: all taxes, assessments, governmental charges and fees imposed upon the Shopping Center but not limited to any occupancy, gross receipts, real estate or rent taxes paid by Landlord and reasonable legal costs and fees to contest or reduce Taxes, but no income or franchise tax or any other taxes imposed or measured by Landlord's income or profits unless the same is in lieu of real estate taxes; (g) Maintenance of Open Space and Related Expenses: landscape and lawn care, sprinkler system service, maintenance of lighting facilities and signs, power broom sweeping parking lot surfaces and drives, restriping, resealing and repaving asphalt surface areas, maintenance of signs, lakes, banks of lake, trash structures and rubbish removal, and in general any and all items related to the maintenance and replacement of asphalt surface areas, landscape, sodded areas, sidewalks, lakes, and retention areas and any property adjoining or near the Shopping Center maintained by Landlord. It is the intent of the parties that this shall be a fully net lease and that, except for those costs which are expressly set forth herein as excluded from Operating Expenses, all costs shall be paid by Tenant.

Prior to the Rent Commencement Date and each calendar year thereafter (or such other accounting period used by Landlord), Landlord shall furnish to Tenant a written estimate of the Operating Expenses and Tenant's Share thereof for the ensuing calendar year or portion thereof. Tenant shall pay to Landlord on the first day of each calendar month during the Term, in advance, one-twelfth of Tenant's Proportionate Share of the Operating Expenses based on Landlord's estimates (which estimates may be adjusted by Landlord at any time upon written notice to Tenant). Tenant's Proportionate Share of Operating Expenses for any partial calendar year shall be pro-rated. After the end of each calendar year (or other accounting period used by Landlord), Landlord shall furnish to Tenant a reconciliation statement setting forth in reasonable detail the actual Operating Expenses for the immediately preceding year, Tenant's Proportionate Share for such year, payments made by Tenant for such year and Landlord's new estimate of Tenant's Proportionate Share of Operating Expenses for the current year. If Tenant's Proportionate Share of Operating Expenses for the prior year exceeds Tenant's payments as shown on the statement, then Tenant shall pay the difference to Landlord within thirty (30) days thereafter. If the statement indicates an overpayment by Tenant, then Tenant shall be entitled to a credit against installments next becoming due hereunder. If Tenant fails to receive the statement with the new estimate, Tenant shall continue to pay Tenant's Proportionate Share of Operating Expenses based on the prior estimate and upon receipt of the new estimate shall immediately pay the difference to Landlord.

Upon not less than thirty (30) days' prior written notice to Landlord, received by Landlord not later than ninety (90) days after Tenant's receipt of a reconciliation statement of Operating Expenses from Landlord, Tenant shall have the right during normal business hours to audit Landlord's records with respect to any Operating Expenses passed through to Tenant for such corresponding calendar year. Failure of Tenant to audit Landlord's records within such ninety (90) day period shall be deemed a waiver of Tenant's right to audit or dispute any of the Operating Expenses contained in such statement, which shall thereafter be deemed final and conclusive. Tenant shall not use a contingency fee based auditor for conducting its audit and Tenant shall reimburse Landlord for all costs incurred by Landlord in connection with Tenant's audit. All information obtained during such audit shall be held in confidence by Tenant, its employees, agents and auditors.

**Section 2.4 UTILITIES.** Tenant shall pay promptly, as Additional Rent, as and when the same become due and payable all water charges, sewer charges and all charges for electricity, gas, heat, steam, hot and/or chilled water, and all other utilities supplied to the Leased Premises commencing upon Tenant's acceptance of the Leased Premises and throughout the Term. If such utilities are not separately metered and are used in common with other tenants, Tenant will pay to Landlord a proportionate share (based on the square footage of the Leased Premises) or other reasonable allocation of the total meter charges within thirty (30) days of receipt of a statement from Landlord. Tenant shall pay all "tap and impact" fees and charges for connection of utilities to the Leased Premises and its proportionate share of all security deposits charged by utility providers. Landlord shall not be liable for any interruption of utilities unless solely due to the gross negligence or willful misconduct of Landlord.

### ARTICLE III
### CONSTRUCTION OF LEASED PREMISES

The Leased Premises are complete and no construction is required.

### ARTICLE IV
### USE

**Section 4.1 USE.** Tenant agrees that the Leased Premises shall be used only for the Permitted Use and subject at all times to the exclusive uses and prohibited uses applicable to the Shopping Center. Tenant will not change the Trade Name of the business operated therein without the prior written consent of Landlord. Tenant shall not do anything which may interfere with the rights of other tenants in the Shopping Center nor shall Tenant use the Leased Premises for any unlawful or immoral purpose or in violation of any applicable governmental codes, laws, or ordinances ("Laws"). Tenant shall not cause or permit the Leased Premises to be used for the manufacture, storage, use, release or disposal of hazardous materials. Tenant shall, at its sole cost, promptly comply with all Laws now or hereafter enacted with respect to the Leased Premises whether in order to meet the special needs of Tenant or by reason of the occupancy thereof or otherwise, and Tenant shall make all alterations and additions to the Leased Premises required by applicable governmental authorities with respect thereto. Without limiting the generality of the foregoing, Tenant shall, at its sole cost, promptly comply with all requirements of the Americans With Disabilities Act ("ADA") with respect to the Leased Premises.

DH

N·M
6-21-2011

**Section 4.2  CONTINUOUS OPERATION.**  Tenant shall open for business in the entire Leased Premises fully fixtured, stocked and staffed on the Rent Commencement Date and continuously operate in the entire Leased Premises at all times during the Term under Tenant's Trade Name. Tenant shall conduct business in the Leased Premises at least six days per week (Monday – Saturday) during the hours designated by Landlord. A vacation or cessation of operations of any other tenant in the Shopping Center shall not release Tenant from any it obligations hereunder.

**Section 4.3  RULES AND REGULATIONS.**  Tenant and its employees and agents shall observe and comply with all rules and regulations set forth in Exhibit "E" attached hereto and by this reference incorporated herein or as promulgated by Landlord in the future upon notice to Tenant.

**Section 4.4  SIGNS.**  Tenant shall, at its cost, erect on the exterior of the Leased Premises a sign subject to the prior written approval of Landlord. Tenant shall submit detailed drawings to Landlord of such signage. All signs shall be in compliance applicable Laws. Tenant shall not place any sign, awning, canopy, decoration, lettering or advertising matter on any door or window of the Leased Premises without Landlord's prior written consent. Tenant shall keep insured and maintain all signs in good condition, repair and operating order at all times and promptly repair any damage to same. Failure of Tenant to install an exterior sign on the Leased Premises prior to the Rent Commencement Date shall be a material default of this Lease.

**Section 4.5 SALES REPORTS.**  Not applicable.

**ARTICLE V**
**INSURANCE**

**Section 5.1  TENANT'S INSURANCE.**  Tenant shall, at its cost, procure and maintain beginning on the date Tenant is given access to the Leased Premises for any purpose and keep in force at all times thereafter during the Term the following insurance with respect to the Leased Premises: (a) Commercial General Liability Insurance with contractual liability coverage for the Leased Premises, entranceways, sidewalks and any surrounding common areas, with a minimum single limit of $1,000,000 per occurrence; (b) Special Form Property Insurance (or its successor coverage) and flood insurance for the full replacement cost of all permanent leasehold improvements and betterments installed by Tenant to the Leased Premises and all personal property, trade fixtures, furniture, equipment and merchandise therein; (c) Plate Glass Insurance in amounts sufficient to replace all plate glass in the Leased Premises; (d) Workmen's Compensation and Employer's Liability Insurance in the amounts required by the laws of the State of Florida, which shall also be carried by any contractors and subcontractors of Tenant; (e) in the event that Tenant produces, sells, or serves any beer, wine, liquor or other product containing alcohol, Tenant shall carry liquor liability insurance in the amount of One Million Dollars ($1,000,000) per occurrence/One Million Dollars ($1,000,000) aggregate; and (f) such other insurance as Landlord or any mortgagee may reasonably require. In addition, Tenant shall carry (or cause its contractors and subcontractors to carry) and keep in full force and effect, at Tenant's cost, prior to commencement of and during construction of Tenant's Work and the performance of any other construction or alterations to the Leased Premises, Builders' Risk Insurance for the full replacement cost of all such work.

All insurance policies shall be in a form satisfactory to Landlord and written with insurance companies satisfactory to Landlord. All insurance shall name Landlord and Landlord's designees as an additional insureds and/or as loss payees, as applicable, and shall provide that such insurance will not be terminated or modified without thirty (30) days' advance written notice to Landlord. The minimum limits of commercial general liability insurance provided above shall not limit or diminish Tenant's liability hereunder. Tenant shall deliver to Landlord at least fifteen (15) days prior to the time such insurance is first required to be carried hereunder, and thereafter at least fifteen (15) days prior to the expiration of such policy, evidence of such insurance satisfactory to Landlord together with evidence of payment of premiums therefor. Any minimum limits of coverage provided above shall be subject to increase at any time and from time to time if Landlord reasonably determines an increase is necessary. Tenant shall provide Landlord with evidence of such increased coverage within thirty (30) days after notice of an increase from Landlord. If Tenant fails to obtain any of the foregoing insurance, Landlord may, but shall not be required to, purchase same on Tenant's behalf and Tenant shall immediately pay to Landlord, as Additional Rent, all costs incurred by Landlord with respect to same.

**Section 5.2  WAIVER OF SUBROGATION AND CLAIMS.**  Landlord and Tenant hereby release the other and all other persons claiming under it from any and all liability for loss or damage caused by any casualty, even if the casualty is brought about by the fault or negligence of the other or of any persons claiming under the other. Tenant and Landlord will cause their respective insurance companies to endorse their respective insurance policies to permit a waiver of subrogation. Landlord and Tenant hereby waive any and all claims and right of recovery against the other and against the officers, members, partners, employees, agents and representatives of the other for damage, loss or injury caused by or resulting from fire and/or other perils, regardless of whether or not any such claims for damages, losses or injuries are or would be covered by any property insurance policies which the waiving party does or is required to maintain hereunder, without regard to deductible limits.

**ARTICLE VI**
**REPAIRS AND MAINTENANCE**

**Section 6.1  BY LANDLORD.**  Landlord shall make necessary maintenance and repairs to the structural portions of the Leased Premises including the exterior walls (excluding the roof, the responsibility for maintenance, leak repair, and replacement when necessary

of are Tenant's responsibility, and the exterior of and the frames surrounding all window, doors, plate glass, store fronts and signs which are Tenant's responsibility), foundation, and load-bearing structural columns and beams and to the sidewalks, parking areas and curbs. Landlord shall not be required to make any repairs caused by the negligent or willful misconduct of Tenant or anyone claiming under Tenant, any repairs, alterations or improvements by Tenant or anyone claiming under Tenant, or casualty or condemnation (except as provided in Article VIII). In no event will Landlord be liable for damages or injuries arising from its failure to make said repairs. Tenant waives the provision of any law or statute, or any right common law, permitting Tenant to make repairs at Landlord's expense. Such repair and maintenance obligations of Landlord shall be included in and constitute Operating Expenses.

Section 6.2  BY TENANT.  Except as provided in Section 6.1 above, Tenant shall make and pay for all maintenance, repairs, and replacements of every kind to the Leased Premises and all equipment and systems exclusively serving the Leased Premises necessary to keep the same in a good state of repair and operating order (including but not limited to the storefront, exterior entrances, exterior walls, plate and window glass, glass and show moldings, doors, show windows, windows, interior walls and partitions, interior side of exterior walls, ceilings, floors, floor coverings, lighting, store signs, plumbing, sewage, electrical and HVAC [as defined below] systems including all ducts, vents, exhaust and roof curbing and flashing associated with the same, sprinklers, furnishings, fixtures and equipment and all other interior non-structural portions of the Leased Premises) and in reasonably clean condition (including reasonably periodic painting of the Leased Premises) and perform all repairs and alterations required by applicable Laws. Beginning at the point from which they serve the Leased Premises exclusively (whether located inside or outside the Leased Premises), Tenant shall, at its sole cost, make repairs and replacements necessary to maintain in good repair and condition all lines, apparatus, ducts and equipment relating to utilities (including but not limited to heating, air conditioning, water, gas, electricity and sewage). Tenant shall at its cost promptly replace all broken or damaged glass in the Leased Premises. Without limiting the foregoing, Tenant specifically acknowledges that the maintenance of the exhaust hoods located in the Leased Premises are the responsibility of Tenant, but that such exhaust hoods are the property of Landlord and shall remain on the Leased Premises at the expiration or earlier termination of this Lease.

At all times during the Term, Tenant will, at its cost, maintain a service contract with licensed air conditioning firm acceptable to Landlord to perform monthly inspection and service to the heating, ventilating and air conditioning system servicing the Leased Premises ("HVAC") (including changing belts, filters and other parts as reasonably required) and repairs, maintenance and replacements to the HVAC to maintain same in good operating order and condition. Prior to the Rent Commencement Date and thereafter annually, Tenant shall furnish Landlord with a copy of the HVAC maintenance contract required above and proof of payment of the annual premium therefor.

If (a) Tenant fails to perform any repair, replacement or maintenance obligation required hereunder, (b) Landlord determines that emergency repairs are necessary or (c) repairs or replacements to the Leased Premises, Common Areas and/or Shopping Center are required due to the negligence or willful misconduct of Tenant or anyone claiming under Tenant, then in any of such events, Landlord may make such repairs, and upon completion thereof, Tenant shall promptly pay to Landlord, as Additional Rent, all costs incurred by Landlord in making such repairs plus twenty percent (20%) for overhead.

## ARTICLE VII
## ALTERATIONS

Section 7.1  BY LANDLORD.  Notwithstanding anything to the contrary contained herein, Landlord reserves the right at any time and from time to time, provided visibility of and access to the Leased Premises shall not be materially, adversely and permanently affected, to change the size, layout and dimensions of the Shopping Center and any part thereof; locate, relocate, alter and modify the number and location of buildings or improvements, building dimensions, number of floors, identity and types of other stores and/or other tenants and the Common Areas or any portion thereof located from time to time in the Shopping Center; enlarge or reduce the Shopping Center; make alterations or additions to the Leased Premises and construct other buildings adjoining same; construct additional buildings and improvements in the Shopping Center; and sell or lease any part of the land or buildings comprising the Shopping Center.  Landlord shall use commercially reasonable efforts to minimize disruption to Tenant's business during the performance of the foregoing except in the event of an emergency.

Section 7.2  BY TENANT.  At Tenant's sole expense, Tenant may alter, renovate or improve the interior non-structural portions of the Leased Premises, provided that Tenant has obtained the prior written consent of Landlord and Tenant is not in default of this Lease. All work shall be performed in a good and workmanlike manner and in compliance with all applicable Laws and all requirements of this Lease.  Prior to the commencement of such work, Tenant shall submit for Landlord's written approval, two (2) sets of the plans and specifications for Tenant's work and Tenant shall cause Landlord's requirements for bonding, insurance and contractor requirements to be satisfied.  Landlord's approval shall be evidenced by returning to Tenant one (1) set of plans and specifications initialed by Landlord.  Any work performed by Tenant under this Section 7.2 shall be so conducted so as not to interfere with the use by other tenants of the Shopping Center.  Tenant shall not make any changes, alterations or improvements to the exterior or the structure of the Leased Premises.

## ARTICLE VIII
## DESTRUCTION OR CONDEMNATION

DH    N.M.
      6-21-2011

**Section 8.1 DESTRUCTION.** Tenant shall give Landlord prompt written notice of damage to any portion of the Leased Premises resulting from fire or other casualty. If (a) the Leased Premises shall be damaged by an occurrence which is not covered by Landlord's insurance; (b) the Leased Premises shall be damaged during the last two years of the Term; (c) the Shopping Center buildings are damaged to the extent of more than twenty five (25%) of the replacement cost, or (d) the Leased Premises are damaged to the extent of twenty five percent (25%) of the replacement cost, then in any of such events, Landlord may terminate this Lease upon the date set forth in Landlord's notice, which date shall be at least thirty (30) days after the date of Landlord's notice. In the event that the Leased Premises are wholly or partially untenantable as a result of such fire or casualty, there shall be a fair and equitable proportionate abatement of all Rent during that period based on the proportion of the Leased Premises rendered untenantable. If this Lease is not terminated by Landlord as aforesaid then this Lease shall continue in full force and effect (Tenant waives any right conferred by any applicable law to terminate this Lease based on the damage) and Landlord shall rebuild the Leased Premises to the condition existing when the Leased Premises was originally delivered to Tenant (but only to the extent insurance proceeds are adequate and available for such purposes); and upon Landlord providing Tenant written notice of the completion thereof, Tenant shall diligently restore Tenant's property and promptly reopen for business and commence the payment of all Rent required hereunder. Tenant shall use the proceeds of any recovery on Tenant's insurance policies for restoration of improvements made by Tenant to the Leased Premises damage (including all permanent leasehold improvement and betterments), and for restoration and/or replacement of Tenant's equipment, trade fixtures and inventory, and to cover any business interruption loss.

**Section 8.2 CONDEMNATION.** If the whole of the Leased Premises are taken in connection with eminent domain or sale in lieu thereof, the Term shall expire when Landlord shall be divested of its title, and Rent shall be apportioned as of that date. If only part of the Leased Premises is taken in connection with eminent domain, and the Floor Area of the Leased Premises is reduced by more than twenty five percent (25%) and the part remaining shall not be reasonably adequate for the operation of Tenant's business, Landlord or Tenant may terminate this Lease by giving the other notice within thirty (30) days after such taking, effective as of the date possession of the taken part shall be required for public use; and Rent shall be apportioned as of that date. If this Lease is not so terminated pursuant to this provision, then Landlord shall promptly restore the Leased Premises to a condition comparable to its condition at the time of such condemnation less the portion lost in the taking (to the extent feasible and at a cost to Landlord not to exceed the award received by Landlord after expenses) and this Lease shall continue in full force and effect except that the Rent shall be reduced in proportion to the portion of the Leased Premises lost in the taking. Landlord shall be entitled to all damages in connection with eminent domain, including any portion of the award based on the value of the leasehold estate of the Leased Premises. Notwithstanding the foregoing, Tenant may bring a separate claim in Tenant's name to recover damages for the value of any personal property or movable trade fixtures that were installed by Tenant.

## ARTICLE IX
### SUBORDINATION/ ATTORNMENT AND ESTOPPEL CERTIFICATES

**Section 9.1 SUBORDINATION/ATTORNMENT.** This Lease is subject and subordinate to all ground and underlying leases and all mortgages or other security agreements which now or hereafter affect the Leased Premises and to any and all advancements to be made thereunder and to all renewals, modifications, consolidations, replacements, and extensions thereof. Within ten (10) days after receipt of a written request by Landlord, Tenant shall enter into an agreement provided by Landlord or its lender subordinating this Lease and all interest of Tenant to all ground and underlying leases and mortgages and other security agreements which may now or hereafter effect the Leased Premises and to any and all advances to be made thereunder and all renewals, modification, consolidations, replacements and extensions thereof. In the event any proceedings are brought for foreclosure of any such mortgage, or in the event of exercise of power of sale under any such mortgage, or in the event of a sale by Landlord of its fee or leasehold interest in the Shopping Center or its interest in this Lease, Tenant shall attorn to the mortgagee, transferee or transferee upon any such foreclosure or sale and recognize such mortgagee, transferee or purchaser as landlord under this Lease.

**Section 9.2 ESTOPPEL CERTIFICATE.** Tenant shall, without charge, at any time and from time to time, within ten (10) days after request by Landlord, deliver a written instrument to Landlord or any other person, firm or corporation specified by Landlord, duly executed and acknowledged, certifying that this Lease is unmodified and is in full force and effect (or if there has been any modification, that the same is in full force and effect as modified, and identifying any such modifications), whether or not there are then existing any set-offs or defenses in favor of Tenant against the enforcement of any of the terms, covenants and conditions of this Lease by Landlord, and if so, specifying the same, and whether or not Landlord has observed and performed all of the terms, covenants and conditions on the part of Landlord to be observed and performed, and if not, specifying the same, and the dates to which Rent have been paid and any other additional matters requested by Landlord.

## ARTICLE X
### DEFAULT

**Section 10.1 TENANT DEFAULT.** Any one of the following shall be a default by Tenant: (a) Tenant fails to pay Rent when due hereunder; (b) Tenant fails to perform or observe any agreement, obligation or covenant of this Lease (other than the payment of Rent) and such failure continues for ten (10) days after notice from Landlord (or if same cannot reasonably be cured within ten (10) days, if Tenant fails to commence to cure within ten (10) days and/or fails to diligently prosecute such cure to completion provided such cure period shall not exceed thirty (30) days); (c) Tenant or Guarantor becomes bankrupt or insolvent or makes an assignment for the benefit of creditors or takes the benefit of any insolvency act, or if any debtor proceedings are taken by or against Tenant or Guarantor; (d) a receiver

DH

N.M.
6-21-2011

or trustee in bankruptcy is appointed for any of Tenant's or Guarantor's property and such appointment is not vacated within ninety (90) days from the date of appointment; (e) Tenant's leasehold interest or right to possession of the Leased Premises, or both, passes to one other than Tenant, by assignment, operation of law or otherwise (except as otherwise expressly permitted hereunder), without written consent of Landlord; (f) Tenant ceases doing business at the Leased Premises as determined by Landlord for more than fifteen (15) consecutive days (except for temporary closures due to casualty or condemnation); (g) Tenant vacates or abandons possession of the Leased Premises; and/or (h) the Leased Premises are used for purposes other than the Permitted Use.

In the event of a default by Tenant hereunder, Landlord may, at its option and without further notice, in addition to all other remedies available at law or in equity: (a) terminate the Lease but Tenant shall remain liable as hereinafter provided; (b) repossess the Leased Premises without terminating the Lease, (c) obtain injunctive and declaratory relief and/or specific performance of any term, covenant or condition of the Lease; (d) declare the entire balance of all Rent due under the Lease for the remainder of the Term to be immediately due and payable discounted to present value; (e) perform such obligation on Tenant's behalf and charge Tenant the cost thereof plus twenty percent (20%) of such costs to cover Landlord's overhead as Additional Rent, and (f) institute a distress for rent action and obtain a distress writ under Section 83.11 through 83.19, Florida Statutes and (g) immediately receive the unamortized portion of the Tenant Improvement Allowance, if any, paid to Tenant.

The exercise by Landlord of any right granted hereunder shall not relieve Tenant from the obligation to make all payments of Rent and to fulfill all other obligations and covenants required by this Lease, at the time and in the manner provided herein. Further, notwithstanding any repossession or termination of the Lease, Tenant shall (a) remain liable for all Rent accruing up to the date of such repossession or termination; (b) be liable to Landlord for all costs and expenses incurred in connection with repossession (including attorney's fees), entering into a new lease with another tenant, and preparing the Leased Premises for reletting (including repairing, improving, altering and remodeling the Leased Premises), regardless of whether Landlord relets the Leased Premises or any part thereof for a term less or more than the balance of the Term or grants concessions, allowances or free rent or other inducements to a new tenant; and (c) for each month which would have otherwise constituted the balance of the unexpired Term, pay the deficiency between the Rent that would have been payable, less the net amount of rents actually collected by Landlord from a new tenant, if any. Tenant shall not be entitled to any surplus rents. Landlord shall not be required to use any greater efforts than Landlord uses to lease other properties Landlord owns, to relet the Leased Premises in preference to any other space in the Shopping Center, or to accept rent in an amount less than fair market rent for the Leased Premises. Landlord's failure to relet the Leased Premises shall not release or affect Tenant's liability hereunder and Landlord shall not be liable for failure to relet, or failure to collect rent under any reletting, if any. No re-entry or taking possession of the Leased Premises by Landlord will be construed as an election to terminate unless Landlord notifies Tenant in writing of Landlord's election to terminate the Lease.

**Section 10.2  NON-WAIVER.**  The failure of Landlord to insist upon strict performance of any of the terms, conditions and covenants herein shall not be deemed to be a waiver of any right or remedies that Landlord may have and shall not be deemed a waiver of any subsequent default in the terms and covenants herein contained unless expressly waived in writing by Landlord. No payment by Tenant or acceptance by Landlord of a lesser amount than due from Tenant shall be deemed to be anything but payment on account, and Tenant's payment of a lesser amount with a statement that the lesser amount is payment in full shall not be deemed an accord and satisfaction. Landlord may accept the payment without prejudice to recover the balance due or pursue any other remedy.  Landlord may accept payments even after default by Tenant without prejudice to subsequent or concurrent rights or remedies available to Landlord under this Lease, at law or in equity.  All rights and remedies of Landlord herein or presently or hereafter existing at law or in equity are cumulative and concurrent and the exercise of one or more rights or remedies hereunder shall not waive Landlord's right to exercise any other right or remedy.  The maintenance of any action or proceeding to recover possession of the Leased Premises or any payment of Rent shall not preclude Landlord from thereafter instituting and maintaining subsequent actions or proceedings for the recovery of possession of the Leased Premises or of any other monies that may be due or become due from Tenant.  Any entry or reentry by Landlord shall not be deemed to absolve or discharge Tenant from liability hereunder.

**Section 10.3  TENANT WAIVER.**  Tenant hereby expressly, unconditionally and irrevocably waives all of the following: (a) any right Tenant may have to interpose or assert any claim, counterclaim or setoff in any action brought by Landlord based (in whole or part) on non-payment of Rent even if same is based on Landlord's alleged breach of the Lease (Landlord and Tenant hereby stipulate that any such counterclaim shall be severed and tried separately from the action brought by Landlord for non-payment of Rent); (b) all constitutional, statutory or common law bonding requirements including the requirement under Section 83.12, Florida Statutes that Landlord file a bond payable to Tenant in at least double the sum demanded by Landlord (or double the property sought to be distrained); it being the intention of the parties that no bond shall be required in any distress action; (c) the right under Section 83.14, Florida Statutes to replevy distrained property;  (d) any rights Tenant may have in the selection of venue in any suit by or against Landlord; it being understood that the venue of such suit shall be in the county wherein the Leased Premises is located; (e) any rights Tenant may have to consequential damages incurred by Tenant including but not limited to lost profits and interruption of business as a result of any Landlord default; and (f) any rights Tenant may have in the Leased Premises or any goods or personal property therein if Tenant is evicted and dispossessed of same.

**Section 10.4  FORCE MAJEURE AND UNAVOIDABLE DELAYS.**  Except for the payment of Rent, in the event that either party hereto shall be delayed or prevented from the performance of any act required hereunder by reason of labor disputes, inability to procure materials, failure of power, restrictive governmental laws or regulations or failure of the applicable governmental authority to

DH#    N. M.
       6-21-2011

timely issue permits, fire or other casualty, acts of God, or other reason beyond the reasonable control of the party delayed in performing the act required under the terms of this Lease, then such delay in the performance of such act shall be excused with performance extended for a period equivalent to the period of such delay.

## ARTICLE XI
## OTHER PROVISIONS

**Section 11.1 DEFINITION AND LIABILITY OF LANDLORD AND TENANT.** The term "Landlord" as used in this Lease shall mean only the then owner of the lessor's interest in this Lease, and in the event of a transfer by Landlord of its interest in this Lease, Landlord shall automatically be released from all obligations and liabilities as the lessor subsequent to the transfer. Notwithstanding anything to the contrary contained herein, in the event of a default by Landlord of any of its obligations or covenants under this Lease, neither Landlord nor any of the partners, members, officers, directors or shareholders of Landlord shall have any *personal liability* whatsoever with respect to same and Tenant shall look solely to the equity of Landlord in the Shopping Center for the satisfaction of Tenant's remedies. The word "Tenant" shall mean each and every person named as Tenant herein and its permitted subtenants, assigns and successors. If more than one party executes this Lease as "Tenant", the liability of all signatories shall be joint and several.

**Section 11.2 RELATIONSHIP OF THE PARTIES.** Nothing contained in this Lease shall be deemed or construed as creating the relationship of principal and agent or a partnership or joint venture between the parties hereto, it being understood and agreed that neither the method of computing Rent nor any other provision contained herein nor any acts of the parties hereto shall be deemed to create any relationship between the parties other than that of Landlord and Tenant. Landlord and Tenant acknowledge that each of them and their respective counsel have had an opportunity to review this Lease and that this Lease shall not be construed for or against either party merely because such party prepared or drafted the Lease or any particular provision.

**Section 11.3 SECURITY DEPOSIT.** Tenant has deposited with Landlord the Security Deposit as security for the performance by Tenant of its obligations under this Lease including payment of Rent. The Security Deposit may be commingled with other funds of Landlord, and Landlord shall have no liability for the accrual or payment of any interest thereon. Landlord may use, retain or apply all or any part of the Security Deposit to cure any default by Tenant under this Lease. If Landlord applies all or part of the Security Deposit to cure a Tenant default, Tenant shall pay promptly to Landlord the amount so applied. If Tenant complies with all terms and conditions of this Lease, the Security Deposit or any balance thereof, shall be returned to Tenant at the expiration of the Term. If Landlord transfers this Lease and Security Deposit to a transferee, Landlord shall be released from liability with respect to the Security Deposit; Tenant shall look only to such transferee with respect thereto.

**Section 11.4 INDEMNITIES.** Tenant shall indemnify, defend and hold harmless Landlord, its officers, employees, agents, property manager (and its agents), contractors and any mortgagee (collectively, "Landlord's Agents") from and against all losses, claims, expenses (including attorneys' fees), liabilities, lawsuits, injuries, and damages of whatever nature if (a) occurring in the Leased Premises, unless caused by the gross negligence or willful misconduct of Landlord or Landlord's Agents; (b) claimed to have been caused by or resulted from any act or omission of Tenant, its agents, contractors, employees, subtenants, assignees, concessionaires and invitees, no matter where occurring; or (c) due to any breach or default by Tenant in the full and prompt payment and performance of Tenant's obligations under this Lease; together with all costs, expenses and liabilities incurred in or in connection with each such claim, action or proceeding brought against Landlord and/or Landlord's Agents, including, without limitation, all reasonable attorney's fees and expenses. In addition, Tenant shall indemnify, defend and hold harmless Landlord and Landlord's Agents from and against all losses, claims, expenses (including attorney's fees), liabilities, lawsuits and damages arising by reason of any clean up, removal, remediation or any other activity required as a result of the presence of hazardous substances in the Leased Premises and/or the Shopping Center caused by Tenant or its employees, agents, contractors or invitees. Landlord shall indemnify, defend and hold harmless Tenant from and against all losses, claims, expenses (including attorneys' fees), liabilities, lawsuits, injuries, and damages of whatever nature occurring in the Leased Premises solely as a result of the gross negligence or willful misconduct of Landlord or Landlord's Agents. The foregoing indemnities shall survive the expiration or earlier termination of this Lease.

**Section 11.5 DAMAGE TO PROPERTY OR PERSONS.** Unless caused by the gross negligence or willful conduct of Landlord, Landlord shall not be liable for any loss of or damage to property of Tenant or of others located in the Leased Premises or the Shopping Center, by theft or otherwise; any injury or damage to persons or property or to the Leased Premises resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain or snow or leaks from any part of the Leased Premises or from the pipes, appliances or plumbing or from the roof, street or subsurface or from any other place or by dampness or by any other cause of whatever nature; any such injury or damage caused by other tenants or any persons in the Leased Premises or the Shopping Center or by operations in the construction of any private, public, or quasi-public work; any defect (latent or otherwise) in construction except for a period of one year from the date of the general construction of the Leased Premises (the parties agree that any liability of Landlord under the preceding clause shall be limited to cost of repair only); any damage or loss of property of Tenant kept or stored in the Leased Premises.

**Section 11.6 ASSIGNMENT/SUBLETTING.** Tenant shall not assign or transfer this Lease or any interest therein, or sublet all or any part of the Leased Premises, without obtaining on each occasion the prior written consent of Landlord. The transfer of any corporate stock, partnership interest or membership interest in Tenant, or a merger, consolidation, acquisition or liquidation of or by Tenant, either voluntarily or by operation of law, shall be deemed an assignment and shall require Landlord's consent, except if Tenant is a public

DH    N.M
6-21-2011

corporation and such transfer of stock is through a recognized stock exchange. Any request for Landlord's consent to assignment or subletting shall be accompanied by a non-refundable payment in the amount of One Thousand Dollars ($1,000.00) for costs incurred by Landlord with respect to same. Any assignment or sublease shall be only for the Permitted Use. In no event shall any assignment or subletting release Tenant from any of its obligations or liabilities under this Lease. Any permitted assignee must assume this Lease in writing in an assumption agreement in form satisfactory to Landlord and Tenant shall deliver an executed copy of same to Landlord ten (10) days prior to the effective date of the assignment. If Tenant shall assign this Lease or sublet the Leased Premises pursuant to the foregoing provisions for rents or any other amounts in excess of the Rent payable hereunder, Tenant shall pay all of such excess rent to Landlord as Additional Rent. Notwithstanding the foregoing, Tenant shall have the right to assign this Lease and Tenant's rights hereunder to an entity of which Tenant is the owner of at least half of the ownership interests thereof, provided, however, that no such assignment shall be effective unless and until (a) such assignee shall have executed a written agreement in the form prescribed by Landlord agreeing that it shall be responsible for the performance of all of the terms and conditions of this Lease on the part of the Tenant to be performed; (b) all of the other owners of such entity shall execute a personal guaranty in the form attached hereto; and (c) Tenant shall acknowledge in writing that Tenant remains bound for the performance of each and every of the terms and conditions of this Lease on the part of the Tenant to be performed and is not released by reason of such assignment

Notwithstanding the foregoing, Landlord shall have the option, by written notice to Tenant within thirty (30) days after receiving any request for consent to a proposed assignment or sublease of all or a portion of the Leased Premises to an unaffiliated entity to recapture the Leased Premises and terminate the Lease or recapture that portion of the Leased Premises subject to the proposed assignment or sublease and terminate the Lease as it relates to the recaptured Space; such termination to be effective on the date provided in the notice to recapture. If Landlord elects to recapture a portion of the Leased Premises, then Rent shall be adjusted accordingly.

**Section 11.7  SURRENDER.** Upon the expiration or sooner termination of the Lease, Tenant shall surrender the Leased Premises to Landlord in broom clean condition and in good repair and condition, reasonable wear and tear excepted. Tenant shall remove all moveable trade fixtures, furniture, inventory and other personal property of Tenant (collectively, "Personal Property") and repair all damage caused by the removal of same. Tenant shall surrender all keys for the Leased Premises to Landlord at the address set forth in Section 1.1(o). If Tenant fails to make such repairs, Tenant shall be liable for and agrees to pay Landlord's costs and expenses in making such repairs plus 20% of such costs to cover Landlord's overhead. Tenant shall not remove any plumbing or electrical fixtures or equipment, heating or air conditioning equipment, floor coverings, walls or ceilings, all of which shall be deemed to constitute a part of the interest and estate of Landlord nor shall Tenant remove any fixtures or machinery that were furnished or paid for by Landlord whether initially installed or replaced. If Tenant fails to remove its Personal Property upon abandonment, recovery of possession of the Leased Premises by Landlord or at the expiration or sooner termination of the Lease as provided above, such Personal Property not removed shall be deemed abandoned by Tenant and at the option of Landlord shall become the property of Landlord and at Landlord's option may be removed by Landlord at Tenant's expense plus twenty percent (20%) as herein provided, or placed in storage at Tenant's expense, or sold or otherwise disposed of, in which event the proceeds of such sale or other disposition shall belong to Landlord. Tenant hereby waives all claims for loss or damage to Tenant's property pursuant to the terms of this paragraph. Tenant's obligations to observe or perform this covenant shall survive the expiration or other termination of this Lease. In addition to the foregoing, Landlord shall have the absolute right to terminate this Lease and remove Tenant from occupancy thereof, upon not less than six (6) months written notice to Tenant, at any time during the Term, for purposes of remodeling, redeveloping or demolishing the Shopping Center. This right reserved by Landlord shall not be impaired or affected by any subsequent change in any Law applicable to this Lease. All costs of vacating the Leased Premises shall be the responsibility of Tenant.

**Section 11.8  HOLDOVER.** If Tenant remains in possession of the Leased Premises after the expiration of the Term without the written consent of Landlord, Tenant shall be deemed a tenant at sufferance, and during such holding over, Rent shall be two hundred percent (200%) of the amount in effect immediately prior to the expiration of the Term and all other provisions of this Lease shall apply insofar as the same are applicable. In addition, Tenant shall indemnify and hold Landlord harmless from all losses, liabilities, claims, damages and expenses arising from such holdover by Tenant after the expiration of the Term including without limitation any claims made by any succeeding tenant as a result of same.

**Section 11.9  LANDLORD LIEN.** In addition to all other remedies set forth herein, in the event Tenant defaults hereunder, Tenant hereby grants to Landlord a lien and security interest on all property of Tenant now or hereafter placed in or upon the Leased Premises, and such property shall be and remain subject to such lien and security interest of Landlord for payment of all Rent herein. The provisions of this paragraph relating to such lien and security interest shall constitute a security agreement under and subject to the Uniform Commercial Code of the State of Florida so that in the event Tenant is in default hereunder Landlord shall have and may enforce a security interest on all such property of Tenant, in addition to and cumulative of Landlord's liens and rights provided by law or by the other terms of this Lease.

**Section 11.10  LIENS.** Tenant shall discharge any lien filed against the Shopping Center or any part thereof for work done or materials furnished at Tenant's request with respect to the Leased Premises within ten (10) days after such lien is filed, failing which Landlord may, in addition to any other remedies under this Lease, remove such lien. Tenant shall pay Landlord, as Additional Rent, the amount of the lien discharged plus all costs and expenses, including, without limitation, attorneys' fees and court costs, incurred by Landlord in discharging such lien. Pursuant to the provisions of Section 713.10, Florida Statutes, notice is hereby given that under no circumstances shall the interest of Landlord in the Leased Premises or Shopping Center be subject to any mechanic's, laborer's or materialman's lien or any other lien or charge on account of or arising from any contract or obligations of Tenant and all such parties must

DH    N.M.
6-21-2011

look exclusively to Tenant to obtain payment for same. Tenant shall deliver written notice of the foregoing provisions to all persons performing work in the Leased Premises. Additionally, if requested by Landlord, Tenant shall promptly execute and deliver to Landlord a notice of non-responsibility, in a form provided by Landlord.

**Section 11.11  LATE CHARGE.** If any payment of Rent is not paid within five days after such amount is due, then in addition to the payment then due, Tenant shall immediately pay to Landlord, as Additional Rent, a late charge equal to the greater of Two Hundred Fifty Dollars ($250.00) or five percent (5%) of all sums past due. In addition, for every thirty (30) day period thereafter that any payment remains past due, interest equal to the lesser of eighteen percent (18%) per annum or the maximum interest rate permitted by law shall accrue on a monthly basis until such delinquent amount is paid in full. If any check, bank draft, ACH or negotiable instrument given to Landlord for any payment under this Lease shall be dishonored, Tenant shall pay an administrative charge to Landlord of One Hundred Dollars ($100.00). Acceptance of any of the foregoing charges will not constitute a waiver of Tenant's default and shall not prevent Landlord from exercising any other rights or remedies in the Lease.

**Section 11.12  CONSENT.** With respect to any provisions of this Lease which either provides or is held to provide that Landlord shall not unreasonably withhold or delay consent or approval unless otherwise provided herein to the contrary, Tenant shall not be entitled to make any claim for, and Tenant hereby expressly waives any claim for damages incurred by Tenant by reason of Landlord's failure to comply therewith; Tenant's sole remedy therefor shall be an action for specific performance.

**Section 11.13  WAIVER OF RIGHT OF REDEMPTION.** Tenant hereby expressly waives any and all rights of redemption conferred by statute or otherwise.

**Section 11.14  NOTICES.** Any notice or other communication which may be or is required to be given by either party to the other hereunder shall be in writing and sent by registered or certified mail, return receipt requested, or delivered by a nationally recognized overnight courier (such as Federal Express or UPS). Any notice or communication under this Lease shall be sent to the addresses set forth in Section 1.1(o) and shall be deemed to have been given on the date it is mailed with sufficient postage prepaid or the date it is given to the courier, and shall be valid and binding regardless of whether such notice is returned undeliverable or the receipt of such notice is otherwise unacknowledged.

**Section 11.15  RECORDING.** Neither this Lease nor any memorandum of this Lease shall be recorded in the public records.

**Section 11.16  ENTIRE AND BINDING AGREEMENT.** This Lease contains the entire agreement between the parties hereto and Tenant warrants that it has not relied upon any representation other than as contained in this Lease and Landlord relies on this representation as an inducement to enter into this Lease. Tenant represents and warrants that it has had the opportunity to have this Lease reviewed by its professional advisors and this Lease is the joint effort of both parties expressing their agreement, and that it should not be interpreted in favor of or against either party merely because of their efforts in its preparation. Except as provided to the contrary herein, this Lease may not be modified in any manner other than by agreement in writing signed by all parties hereto. The terms, covenants and conditions contained herein shall inure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns, except as otherwise expressly provided in this Lease.

**Section 11.17  PROVISIONS SEVERABLE.** If any term or provisions of this Lease or the application thereof to any person or circumstance shall, to any extent, be held to be invalid or unenforceable by a court of competent jurisdiction, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**Section 11.18  CAPTIONS/TIME.** The captions contained herein are for convenience and reference only and shall not be deemed a part of this Lease or construed as in any manner limiting or exemplifying the terms and provisions of this Lease to which they relate. Time is of the essence.

**Section 11.19  RADON GAS.** Florida Statutes 404.056(8): Radon gas is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities may present health risks to persons who are exposed to it over time. Levels of Radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county health unit.

**Section 11.20  NO OPTION/EXECUTION.** The submission by Landlord to Tenant of this Lease shall be deemed solely for examination purposes only and not for acceptance. Such submission shall have no binding effect and shall not create any rights or impose any obligations upon either party. The execution of this Lease by Tenant shall be irrevocable. This Lease shall have no binding force and effect unless and until Tenant and Landlord have executed this Lease and a duplicate executed original shall have been delivered by Landlord to Tenant.

**Section 11.21  BROKER.** Tenant represents and warrants to Landlord that it has not dealt with any broker, finder or other person entitled to compensation in connection with this Lease (other than the Broker identified in Section 1.1(p) and there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease. Tenant agrees to indemnify, defend and save

DH

N.M.
6-21-2011

Landlord harmless from all liabilities and claims (including legal fees) arising from a breach of the foregoing. The foregoing indemnity shall survive the termination of this Lease.

**Section 11.22  RELOCATION.** Not applicable.

**Section 11.23  WAIVER OF TRIAL BY JURY.** Landlord and Tenant mutually agree that they waive trial by jury in any action, proceeding or counterclaim brought by either party against the other as to any matters arising out of or in any way connected with this Lease.

**Section 11.24  ACCESS.** Landlord shall have the right (but not the obligation) to enter the Leased Premises at all times upon reasonable prior notice (except in the event of an emergency) to make any repairs and alterations or to inspect or to show the Leased Premises to prospective purchasers or mortgagees. Commencing six (6) months prior to expiration of the Term, Landlord may show the Leased Premises to prospective tenants and/or to maintain "For Rent" signs on the Leased Premises.

**Section 11.25  APPLICABLE LAW AND ATTORNEYS' FEES.** This Lease shall be governed by, construed and enforced in accordance with the laws of the State of Florida. If either party brings an action to enforce the terms of this Lease or declare rights hereunder, the prevailing party in such action, on trial or appeal, shall be entitled to recover all reasonable costs and expenses (including without limitation court costs and reasonable attorneys' fees) incurred by such prevailing party from the non-prevailing party.

**Section 11.26  COUNTERPARTS.** This Lease may be executed in counterparts, each of which shall be an original, and all of which shall constitute one instrument.

**Section 11.27  GUARANTY.** This Lease shall be subject to the execution by Guarantor of the guaranty attached hereto and delivery of same to Landlord with the executed Lease.

**Section 11.28  RIDER.** If any provision contained in a Rider to this Lease is inconsistent with any other provisions herein, the provision contained in the Rider shall control unless otherwise provided in the Rider.

**Section 11.29  EQUIPMENT.** It is understood and agreed that the equipment described on the attached list of equipment is the property of Landlord, and has been left in the Leased Premises for the use of Tenant. Tenant agrees that Tenant shall pay applicable commercial tangible personal property taxes levied in connection with this equipment, and acknowledges that it is the Tenant's responsibility for maintenance and repair and replacement of such equipment when repairs are no longer economically viable. Upon the vacating of the Leased Premises by Tenant, such equipment and applicable replacement equipment shall be left within the Leased Premises.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this Lease as of the day and year first above written.

Signed, Sealed and Delivered in the Presence Of:

Landlord: 786 PROPERTY, INC., a Florida corporation

By: _____

AFM Nurul Momen

Its: President

Date: _6 - 21 - 2011_____, 2011

Tenant: _____

DAISY HELM

Date: _____, 2011

DH    6 - 21 - 2011

LIST OF EQUIPMENT ATTACHED TO LEASE BETWEEN
786 PROPERTY, INC., a Florida corporation and
DAISY HELM
7796 Wiles Road, Coral Springs, FL 33067

1        2 EXHAUST HOODS

LAW OFFICES

# MARK PERLMAN, P.A.
4651 SHERIDAN STREET, SUITE 200
HOLLYWOOD, FLORIDA 33021

MARK PERLMAN*
*ALSO ADMITTED IN NEW YORK

TELEPHONE (954) 456-1333
FACSIMILE (954) 454-5081

March 29, 2023

**VIA FEDEX**
Daisy Helm
LA Union, Inc.
7796 Wiles Road
Coral Springs, FL 33067

        Re:    Rudolph Betancourt v. 786 Property, Inc.
               U.S.D.C. for the Southern District of Florida
               Case No.: 23-cv-60478-AHS

Dear Ms. Helm:

Please be advised that I am the attorney for your Landlord pertaining to your lease violation resulting in a lawsuit against 786 Property, Inc., a copy of which is attached hereto for your review.

Article 4.1 of your Lease Agreement dated June 21, 2011 provides in pertinent part as follows:

> "Tenant shall, at its sole cost, promptly comply with all requirements of the Americans With Disabilities Act ("ADA") with respect to the Leased Premises."

Article 6.2 of your Lease further provides in pertinent part as follows:

> "Except as provided in Section 6.1 above, Tenant shall . . . perform all repairs and alterations required by applicable Laws."

786 Property, Inc. has been sued in the above-styled cause for seventeen (17) different violations of the Americans Disability Act and Regulations enacted pursuant to the Act.

Accordingly, you have breached your Lease Agreement by failing to perform the repairs and alterations to the demised premises as required by the ADA and its Regulations.

Article 11.4 of your Lease Agreement provides in pertinent part as follows:

> "Tenant shall indemnify, defend and hold harmless Landlord . . . from and against all losses, claims expenses (including attorney's fees) liabilities, lawsuits, injuries and damages of whatever nature if (b) claimed to have been caused by or resulted from any act or omission of Tenant . . . together with all costs, expenses, and liabilities incurred in or in connection with each such claim, action or proceeding brough against Landlord and/or Landlord's agents, including without limitation, all reasonable attorney's fees and expenses."

# EXHIBIT "B"

SOUTH FLORIDA LAW  •  Internet: www.SoFlaLaw.com  •  E-Mail: MPerlman@SoFlaLaw.com

NOTICE OF DEFAULT:  You are hereby notified that upon your failure to indemnify the Landlord against the foregoing lawsuit within TEN (10) DAYS of date hereof that the Landlord will declare a default under Article 10.1 of the Lease.

Upon your default in the terms of Lease Agreement, the Landlord will take all legal action provided for in Article X of the Lease, including but not limited to terminating your Lease, filing a lawsuit against you for injunctive relief or specific performance to compel your compliance with the lease, declare the entire balance of all rent due under the Lease for the remaining term to be immediately due and payable, perform the repairs required and charge you the cost thereof, plus twenty (20%) of such costs to cover Landlord's overhead as additional rent, seek court costs and attorney's fees pursuant to Article 11.4 of the Lease Agreement.

PLEASE GOVERN YOURSELF ACCORDINGLY!!!


Yours truly,

Mark Perlman

MP/nt

N:\LETTERS\786.Properties.Indemnity.DMD.docx